UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| GLENDA CROWE, *Administratrix of the Estate of James Crowe*, | ) ) ) | |
| Plaintiff, | ) ) | No. 5:20-CV-203-REW |
| v. | ) ) | OPINION & ORDER |
| TRAVIS STEWARD, | ) ) ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Society relies on police officers to show up and bring order to chaos. Officers do not get to choose the calls they answer and must respond wherever, whenever the radio directs. Too often, this means wading into the volatility and risks of domestic violence. The present case concerns a police shooting that arose from a domestic violence dispatch. Officer Steward from the Nicholasville Police Department (NPD) responded to a 9-1-1 call to find James Crowe impaired, wroth, leaning out of a second-story window, hurling insults and threats, and slamming the side of his home with clenched fists. Upon confirming that Crowe had assaulted his fiancée, Steward and his colleagues, per NPD policy, had to arrest Crowe. They entered the house and approached the stairs. In the meantime, Crowe had armed himself with a knife. They cautiously ascended halfway up the staircase, announced their presence, and made visual and verbal contact. Crowe verbally skirmished with the officers—openly brandishing the knife and refusing to comply with orders to disarm. He threatened them, becoming increasingly agitated, and then advanced toward Steward, knife in hand. Officer Steward, confronted by an armed, angry, and advancing suspect, fired his pistol three times. Crowe died from the gunshot wounds. The record—depositions and body cam

1

video—captures and reflects this brief but intensive encounter. The lone evidence of the critical moment of decision comes from Steward's depo and the camera he wore.

Crowe's estate sued Officer Steward in Jessamine Circuit Court, alleging excessive force under 42 U.S.C. § 1983, and state-law battery and negligence. *See* DE 1-3 at ¶¶ 25-48. Officer Steward promptly removed the case to this Court. *See* DE 1 (Notice of Removal). Now, at the conclusion of discovery, Officer Steward moves for summary judgment. *See* DE 24. Crowe responded in opposition. *See* DE 31. Officer Steward replied. *See* DE 34. The matter is ripe for review.

## I. Facts[1]

Minutes before midnight on August 21, 2019, Officer Steward and two other NPD officers were dispatched to a Nicholasville home in response to a domestic violence 9-1-1 call. *See* DE 26-1 at 61:8-63:14 (Lt. Godsey Dep.). The officers pulled up with lights and sirens "blaring" but could not immediately locate the disturbance. DE 26-1 at 65:17-67:16, 77:1-8; *see also* DE 26-3 (Steward Dep.) at 65:17-21. They looked around. Then, they heard screaming. DE 28-10 at 0:42-45; *see also* DE 26-1 at 77:9-15.

The officers jogged toward the noise to find an enraged James Crowe leaning out of a broken upstairs window, spewing profanities at his fiancée. DE 28-10 at 0:45-1:15; *see also* DE 26-1 at 77:11-78:11. Crowe's fiancée stood outside the home, a short distance away, and spoke with Lt. Godsey—Officer Steward's supervisor. DE 28-7 at 0:13-1:18; *see also* DE 26-1 at 78:19-24. After roughly a minute of Crowe smashing the side of his home, threatening the officers and others, and yelling at those gathered below, Crowe's fiancée walked over and opened the front

---

[1] Where, as here, there is footage of the incident, the Court views the applicable facts "in the light depicted by the videotape." *Green v. Throckmorton*, 681 F.3d 853, 862 (6th Cir. 2012). The footage is in a conventional filing at DE 28.

door. DE 28-10 at 2:40-56; DE 28-7 at 1:16-33. The police entered. DE 28-10 at 2:51-56; DE 28-7 at 1:33-37. Lt. Godsey secured consent for the entry; he had gathered probable cause to believe that Crowe assaulted fiancée Hicks, which required an arrest under NPD policy.[2] *See* Godsey Dep., at 15-16, 64 (discussing consent and cause); Steward Dep., at 69-70 (discussing NPD policy). Godsey was in charge of the scene and directed Steward to enter.

Officer Steward led the way with his pistol drawn. Lt. Godsey followed with his taser out, and Officer Balltrip covered the rear with his hands free.[3] DE 28-10 at 2:55-3:20; DE 28-7 at 1:38-58; DE 28-4 at 1:55-2:20. They arrived at the stairs. DE 28-10 at 3:19-22; DE 28-7 at 1:59-2:02. The stairs had a landing mid-flight, then a switch back to the top; thus, about halfway up, there was a landing with a turn to complete the way to the second floor. Officer Steward and Lt. Godsey slowly ascended the stairs until they were just below the landing. DE 28-10 at 3:22-29; DE 28-7 at 2:02-9. The officers announced themselves: "Police! Come on out!" DE 28-10 at 3:30-33; DE 28-7 at 2:10-13. Crowe responded, "come up, get stuck." DE 28-10 at 3:33-35; DE 28-7 at 2:13-15. Officer Steward commanded Crowe, "show me your hands now!" DE 28-10 at 3:37-38; DE 28-7 at 2:17-18. Crowe said, "I hope to die." DE 28-10 3:38-39; DE 28-7 at 2:18-19. Officer Steward repeated his command, and Crowe repeated his response, both men shouting to and over the other. DE 28-10 at 3:39-45; DE 28-7 at 2:19-25. Throughout the verbal exchange, Officer Steward remained on the landing, pistol drawn, and peeking around the corner. *See id.* at 3:30-45; DE 28-7 at 2:10-25. The video partially captures the scene, but the camera angle

---

[2] The assault fourth elements are at KRS 508.030. *See also* KRS 500.080(15)(defining physical injury). Importantly, though such assault is a misdemeanor, Kentucky law expressly permits warrantless arrest for assault in the context of domestic violence. *See* KRS 431.005(2)(a). Plaintiff does not contest the existence of probable cause to arrest.
[3] Balltrip exited the home a few seconds later, per Godsey's order, to ensure Crowe did not leave through the second-story window. *See* DE 28-4 at 2:21-37.

is a limitation. The audio is complete, and the video, while not showing each stair-step or giving a full view, certainly reflects the spatial relationships and relative movements of the participants.

Crowe then showed himself leaning out of a doorframe at the top of the stairs, at which point Officer Steward exclaimed "he's got a knife!" DE 28-10 at 3:45-46; DE 28-7 at 2:25-26. Lt. Godsey shouted "drop the knife!" DE 28-10 at 3:46-47; DE 28-7 at 2:26-27. Officer Steward followed suit, repeatedly ordering Crowe to drop the weapon. DE 28-10 at 3:47-4:09; DE 28-7 at 2:27-49. Despite the officers' commands, Crowe continued to lean out of the upstairs room, yelling down at the officers. DE 28-10 at 3:50-4:20; *see also* DE 28-7 at 2:30-3:00. Steward testified that Crowe had an open-bladed knife in his right hand and that Crowe repeatedly stabbed or punched the wall with that hand. *See* Steward Dep., at 83-84. As Officer Steward continued to order Crowe to drop the knife, abruptly Crowe grabbed the left handrail and started to descend the stairs toward the officers, knife still in hand. DE 28-10 at 4:21-25; *see also* DE 3:01-05; Steward Dep., at 10-12. Officer Steward exclaimed in surprise and fired three shots at Crowe, each hitting him in the chest. DE 28-10 at 4:22-25; DE 28-7 3:02-05. Steward backpedaled down the stairs and simultaneously exclaimed "he charged." *See id.* at 4:29-30; DE 28-7 at 3:09-10. Crowe eventually died of the gunshot wounds. DE 26-1 at 152 (Deposition Exhibit 4: Crowe NPD Level of Resistance Incident Reporting Form) (documenting that the Jessamine County Coroner pronounced Crowe dead on the scene); DE 26-3 at 168 (Deposition Exhibit 3: Steward NPD Level of Resistance Incident Reporting Form) (documenting that Crowe was pronounced dead on the scene). Crowe had continued to hold the knife immediately after the shooting, and Godsey disarmed him, in part, via deployment of a taser. *See* Godsey Dep., at 27-28. Plaintiff does not contest the presence of the knife.

## II. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider the nonmovant's evidence and draw all reasonable inferences in the nonmovant's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986); *Lindsay*, 578 F.3d at 414. If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). Thus "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356. Such evidence must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

The context melds the summary judgment approach with the presented qualified immunity questions. Thus:

> Yet the qualified-immunity defense does not change the normal summary-judgment rules. So when deciding whether force was excessive or whether our precedent clearly established that result, we must view genuine factual disagreements in the light most favorable to the plaintiff. If a reasonable jury could credit the plaintiff's version of events and if that version clearly shows the excessive nature of the defendants' force, we cannot grant the officers summary judgment.

*Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 400 (6th Cir. 2022) (internal citations omitted).

In a case with video, the defined and objective nature of the proof impacts its evaluation. A video depicting events bounds the field of inferences. A version of facts blatantly contradicted by video proof is not one a court should accept, even at the summary judgment stage. That said,

> But we must nonetheless "view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff," *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017) (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)), and must also "make all reasonable inferences in their favor when undertaking the qualified immunity analysis on summary judgment," *Godawa*, 798 F.3d at 463.

*Shumate v. City of Adrian, Michigan*, 44 F.4th 427, 438 (6th Cir. 2022). Significantly, Plaintiff here does not have an independent version of the events (*e.g.*, from an affiant or deponent) to test against the video. Instead, Plaintiff asks the Court to make inferences from or interpretations of the video contrary to the version of Officer Steward, thus yielding a fact question. Importantly, the Court must view the video as it is, in its own light, as to the parts of the scenario captured:

> First, because the events in this case are recorded on video, the facts are viewed in the video's light, not in a light favorable to plaintiff. Second, no competing versions of material fact are before us in this appeal, as the evidence before us is undisputed, since it is revealed on the video.

*Cunningham v. Shelby Cnty., Tennessee,* 994 F.3d 761, 765 (6th Cir.), *cert. denied sub nom. Cunningham v. Paschal*, 211 L. Ed. 2d 400, 142 S. Ct. 711 (2021).

## III. Discussion

*a. Fourth Amendment Excessive Force*

Plaintiff claims, per § 1983, that Officer Steward violated James Crowe's Fourth Amendment rights by using excessive force during the incident. *See* DE 1-1 at ¶¶ 25-33. Officer Steward asserts qualified immunity as the basis for summary judgment. *See generally* DE 24-1. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). An officer receives qualified immunity unless the plaintiff establishes: (1) the officer violated a constitutional right, and (2) the constitutional right was "clearly established." *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020). Because either prong is dispositive, the Court may address the two prongs in any order. *See id.* The doctrine "allows police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Barton*, 949 F.3d at 947 (quoting *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013)).

*1. Fourth Amendment Violation*

The Court first considers whether Officer Steward committed a constitutional violation. The Fourth Amendment protects citizens from excessive force during an arrest, investigatory stop, or other "seizure."[4] *Graham v. Connor*, 109 S. Ct. 1865, 1867-68 (1989). Excessive force claims hinge on "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and

---

[4] The Fourth Amendment provides in relevant part "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend IV.

circumstances confronting them, without regard to their underlying intent or motivation." *Id.*; *see also Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015). The inquiry draws from the totality of the circumstances and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[5] *Graham*, 109 S. Ct. at 1872; *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). Three non-dispositive and non-exclusive factors guide the inquiry: "(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Hicks*, 958 F.3d at 435 (quotation marks omitted) (alteration in original). The Court, in the required segmented approach, considers the reasonableness of each forcible encounter separately. *See Dickerson*, 101 F.3d at 1161 (collecting cases that have "analyze[d] excessive force claims in segments"). The analysis focuses on the moments immediately leading up to the encounter.[6] *See id.* at 1162. Importantly, in the context of

---

[5] Accordingly, officer decisions in tense and uncertain situations receive a measure of deference. *See Burchett v. Keifer*, 310 F.3d 927, 944 (6th Cir. 2002).

[6] Crowe's estate asks the Court to consider the decision to ascend the stairs preceding the fatal encounter as part of the window for analysis. *See* DE 31 at 10-11. The Sixth Circuit has weighed such an argument before and rejected it. In *Kirilova v. Braun*, the Sixth Circuit found the decision to ascend a staircase in search of a suspect—a suspect the officers did not know was armed with a skewer—was distinct from the decision to shoot the armed and advancing suspect. *See* No. 21-5649, 2022 WL 247751, at *4 (6th Cir. Jan. 27, 2022). The same applies here. Lt. Godsey informed Officer Steward that, per NPD policy, they needed to arrest Crowe. *See* DE 26-1 at 65:14-66:4. So, Officer Steward entered the home and partly ascended the stairs to make contact with and possibly arrest Crowe. *See* DE 26-3 at 27:23-28:7, 57:10-14, 81:9-20. At that point, Officer Steward did not know that Crowe was armed. *See* DE 26-3 at 22:23-25. "Though different decisions . . . might have led to a better outcome," it is the decision to use deadly force, not the decision to enter and seek arrest, that is of constitutional moment in this analysis. *Cf. Kirilova*, 2022 WL 247751, at *4-*5; *Graham*, 109 S. Ct. at 1872 (noting courts should not impose "20/20 vision of hindsight"). While Plaintiff criticizes operational choices, the record does not show (and Plaintiff does not marshal) any causal link between a valid entry under lawful policy and the sudden events occurring on the landing. The focus is the seconds around the force, not the causally distinct entry to effect a lawful arrest. Nor does the tactical criticism otherwise impact the Court's view. As the court stated in *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019): "This approach requires us to evaluate the use of force by focusing on the split-second judgment made

deadly force, an officer's use of such force is reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 105 S. Ct. 1694, 1701 (1985).

The undisputed facts are these:

Steward and the other officers, called for a domestic violence complaint, encountered a belligerent, impaired male screaming out a broken window (with glass on the ground below). The officers confirmed that he had, that night, choked his fiancée, inflicting pain and blocking her ability to breathe.

NPD policy required an arrest, and the NPD had probable cause to believe Crowe committed the arrestable offense, under Kentucky law, of assault fourth. Lt. Godsey controlled the scene. He secured the fiancée's consent to enter the home, and Godsey directed his subordinate officer, Steward, to enter in the lead position.

Before entry, Crowe had yelled specific physical threats to the officers and to others.

The officers climbed to the landing and endeavored to eyeball and secure contact with Crowe. *See* Godsey Dep., at 17-23, 57. As they entered, they did not know if Crowe was armed and did not know if he would immediately relent and surrender. As they reached the landing and announced, Crowe made the particular threat, "Come up, get stuck." He also continued to yell, harangue the officers, declare his hope to die, and utterly refuse to disarm.

---

immediately before the officer used allegedly excessive force, not on the poor planning or bad tactics that might have" sequentially resulted in the circumstances of force application. (Internal quotations omitted).

9

The officers repeatedly ordered Crowe to drop his knife. Crowe kept the knife in his hand and, per Steward, was stabbing or hitting the wall with it. The knife remained open and in Crowe's right hand for the full encounter.

The shooting moment featured several clear things. First, Steward did not advance on Crowe. He and Godsey stopped at the landing, essentially holding fast with eyes on Crowe. *See* Godsey Dep., at 17-23 (describing encounter and officers essentially waiting at landing). Steward unequivocally describes Crowe as suddenly grabbing the railing with his left hand and coming down the steps toward him: "And he appeared at the top with the knife, blade open. And he started, in an aggressive manner, coming down the stairs towards us, after making those threats." Steward Dep., at 10. The video, to the extent of what it captures, confirms Steward's accounts. The threats from Crowe and admonitions from Steward and Godsey are plain. The physical situation and orientation (with the landing midway up the full flight, and the gap between Crowe and Steward merely being the ½ flight of stairs in a townhome). Crowe certainly emerges from the right-side room, certainly grasps the railing with his left hand, and certainly begins to move down the stairs toward Steward. His action of clutching the railing and moving in descent is fully consistent with the perception that Steward avers, that Crowe was coming toward him, at close range, in an aggressive and armed manner.

Under the *Graham* analysis, Steward was justified in using lethal force when faced with this armed, angry, and advancing suspect. First, Steward knew that Crowe was suspected of committing domestic violence against his fiancée. *See* DE 26-1 at 61:8-63:14. Per NPD policy, Officer Steward knew that they must arrest Crowe. *See* DE 26-1 at DE 26-1 at 65:14 66:4; DE 26-3 at 68:25-70:20. Also, reflecting the crime gravity, NPD policy demanded Officer Steward give the incident a "high priority response." *See* DE 26-3 at 65:17-23, 68:16-71:7.

10

Second, Crowe presented an immediate danger to the officers. He armed himself with a knife, engaged in repeated tirades against the officers while brandishing the weapon, and refused pleas to disarm himself. DE 28-10 at 3:45-4:22. Then, abruptly, Crowe advanced toward the officers[7]—closing the ½ flight distance with knife in-hand—without any indication of a peaceable surrender or nonviolence. *See id.* at 4:20-4:23. As Crowe advanced, Officer Steward feared for his life. *See* DE 26-3 at 85:22-86:4.

Third and finally, Crowe actively resisted arrest. A suspect resists arrest when "some outward manifestation—either verbal or physical—on the part of the suspect [suggests] volitional and conscious defiance." *Kapuscinski v. City of Gib.*, 821 F. App'x 604, 612 (6th Cir. 2020) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)).[8] Multiple facts suggested volitional and conscious defiance toward the officers. In the moments immediately preceding the shooting, Officer Steward and Lt. Godsey ordered Crowe to "come on out!" DE 28-10 at 3:30-33; DE 28-7 at 2:10-13. Crowe responded with a threat: "come up, get stuck." DE 28-10 at 3:33-35; DE 28-7 at 2:13-15. Officer Steward then ordered Crowe "show me your hands now!" DE 28-10 at 3:37-38; DE 28-7 at 2:17-18. Crowe disregarded the command. DE 28-10 3:38-39; DE 28-7 at 2:18-19. Crowe then revealed he had armed himself with a knife.

---

[7] Crowe's estate argues that the evidence does not show that Crowe "charged" at Officer Steward. *See* DE 31 at 5. The Court disagrees. Viewing the evidence in the light depicted by Officer Steward's body camera recording, Crowe brandished a knife, leaned out of the doorway, and yelled at the officers before grabbing the handrail with his left hand and his left knee bent. *Id.* at 4:00-24. The stair geometry and relative heights undoubtedly signal a person so descending as "charging" the lower-situated person. Crowe's advance on Officer Steward was unannounced and sudden. *Id.* at 4:20-24; *see also* DE 26-3 at 85:22-25.

[8] Examples of suspects resisting arrest include refusing to be handcuffed, *see Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d at 507, 510-11 (6th Cir. 2012), revving an engine and reaching into the backseat of a car appearing to retrieve a weapon, *see Foos v. City of Delaware*, 492 F. App'x 582, 584-85, 590-91 (6th Cir. 2012), and refusing officers' demands to roll over while at the same time physically attempting to stand up, *see Kapuscinski v. City of Gib.*, 821 F. App'x 604, 613 (6th Cir. 2020). Here, Crowe would not disarm despite incessant and clear commands.

11

DE 28-10 at 3:45-46; DE 28-7 at 2:25-26. Officer Steward and Lt. Godsey repeatedly ordered Crowe to "drop the knife!" DE 28-10 at 3:47-4:09; DE 28-7 at 2:27-49. Crowe refused, screamed at the officers, and waved the knife while leaning out of the upstairs doorway. DE 28-10 at 3:50-4:20; *see also* DE 28-7 at 2:30-3:00. These actions, culminating in the stair descent, demonstrate volitional and conscious defiance—both physically and verbally.

The Court sees no reasonable conclusion contrary to the view that Officer Steward acted constitutionally. Only Steward provides direct knowledge of the critical seconds. The video is corroborative of his story—especially the full audio, the video's capture of Crowe's placement and actions, and the moments that record Crowe turning down the stairs, causing Steward to fire. No reasonable juror could adopt the interpretations Plaintiff offers; there is no evidence that Steward went beyond the landing, and there is no evidence that Steward simply shot Crowe as Crowe remained fixed on the second floor. Steward, properly in the home to effect Crowe's arrest, had probable cause to perceive Crowe as posing a threat of serious physical injury, warranting the force applied. No reasonable jury could find otherwise. Qualified immunity properly applies.

Sixth Circuit courts have held that officers in similar circumstances also acted reasonably. *See, e.g.*, *Reich v. City of Elizabethtown,* 945 F.3d at 981 (holding the use of lethal force objectively reasonable where officers shot and killed a suspect brandishing a knife after the suspect refused to drop the knife and walked quickly to within six to twelve feet of the stationary officers); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (holding the use of lethal force objectively reasonable where an officer shot and killed a suspect brandishing a knife after the suspect refused to drop the knife and advanced to within four to six feet of the officer). Most recently, in *Kirilova v. Braun*, the Sixth Circuit found that an officer did not violate the Fourth Amendment when he shot a suspect hiding at the top of a staircase, armed with a skewer, that advanced from ten feet

toward the officer. *See* 2022 WL 247751, at *2. *Kirilova* blueprints the outcome of this case and joins a chorus of precedent showing Officer Steward reasonably used lethal force in the face of life-threatening danger. Crowe had voiced his malicious intent through specific threats, was obviously out of control, was armed with a deadly weapon, would not disarm, and aggressively moved directly toward the armed and proximal officer. Steward acted reasonably, under the measurement of these precedents.

### 2. Clearly Established Right

Even had a constitutional violation occurred, the abridged right was not clearly established. A right is clearly established when "the contours of a right are sufficiently clear" that "every reasonable [officer] would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Barton*, 949 F.3d at 947–48. The Supreme Court admonishes courts not to define the right at "a high level of generality." *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775-76 (2015). "The key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009); *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (characterizing standard as "beyond debate").

The cases cited and discussed show that Steward would not have known he crossed the constitutional line. Indeed, *Reich* was decided after the Crowe shooting, and in *Reich*, the Sixth Circuit found as a "clear answer" that no violation occurred when officers fired on a knife-wielding suspect that was schizophrenic, walked at a face pace toward stationary officers, had been warned at least once to drop a knife, brandished the knife, and finally "took a step toward" the officers. Reich, 945 F.3d at 979. The *Reich* officer-to-suspect gap was "six to twelve feet." *Id.* That same

13

distance surely envelops the ½ flight of steps here. *See also* Godsey Dep., at 23 (depicting first flight as 3-5 steps). This clarity, counter to a position of liability, assures immunity to Steward.

### b. Kentucky Claims

Crowe's estate also asserts two Kentucky tort claims against Steward, battery and negligence. Steward argues that the Kentucky analog to federal qualified immunity—official immunity—bars Crowe's two remaining claims.[9] The Court agrees.

Kentucky official immunity protects officers that make "good faith judgment calls [] in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Specifically, the doctrine protects officers' "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . (2) [made] in good faith; and (3) within the scope of the employee's authority." *Id.* Upon showing an action was within the scope of the officer's discretionary authority, the burden shifts to the plaintiff to prove the officer acted in bad faith. *Id.* at 523. A plaintiff may prove bad faith in two ways: (i) demonstrating the officer violated a clearly established constitutional right, or (ii) producing evidence of the officer's willful or malicious intent to harm the plaintiff or action with a corrupt motive. *See id.*;

---

[9] 28 U.S.C. § 1367(c) provides four scenarios under which a district court may decline to exercise supplemental jurisdiction. The statute is permissive. The discretion to exercise supplemental jurisdiction extends to the summary judgment stage. *See Nails v. Riggs*, 195 F. App'x 303, 313 (6th Cir. 2006). "In exercising discretion, the Court may consider the convenience of the parties and expeditiousness in resolving the case." *Jeung v. McKrow*, 264 F. Supp. 2d 557, 572 (E.D. Mich. 2003) (citing *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 761 (6th Cir. 2000)). Indeed, "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial." *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (citing *Province v. Cleveland Press Publishing Co.*, 787 F.2d 1047, 1055 (6th Cir. 1986)). The same findings for the § 1983 claim underpin analysis of the two state law claims. Expediency and convenience both favor supplemental jurisdiction in this case and, therefore, the Court considers Crowe's two state law tort claims. The normal presumption of remand notwithstanding, the Court considers the intertwined state claims on this complete and ripe record.

*Bryant v. Pulaski Cnty. Detention Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011). The doctrine applies equally to negligence claims and to intentional torts. *See Gati v. W. Ky. Univ.*, 762 F. App'x 246, 253 (6th Cir. 2019).

A police officer's "use of deadly force plainly falls within the scope of a police officer's [discretionary] authority." *See Reich*, 945 F.3d at 982-983 (citing KRS § 503.050(1)-(2)); *see also Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008). Therefore, the burden shifts to Crowe to establish bad faith.

Crowe does not produce any evidence of willful or malicious intent to harm. Further, the Court previously found that Steward did not violate a clearly established constitutional right. *See supra*. The fact that Steward employed reasonable force would foreclose both a constitutional violation and any predicate contrary finding, as to excessive force, under state statutory law. Crowe cannot, therefore, establish bad faith, as necessary to pierce the official immunity that garbed Steward during the fatal encounter. *See Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 835 (Ky. 2021) (considering and rejecting alleged bad faith showing, and putative jury question, against the backdrop of "considerable discretion inherent in law enforcement's response to an infinite array of situations implicating public safety").

Accordingly, Steward is entitled to official immunity on Crowe's battery and negligence claims.[10]

### IV. Conclusion

---

[10] Additionally, an officer's use of force is, if wrongful, "an intentional act of battery[;]" "there is no such thing as a negligent battery." *Woodcock v. City of Bowling Green*, 165 F. Supp. 3d 563, 605-606 (W.D. Ky. 2016) *rev'd on other grounds*, 79 F.App'x 419 (6th Cir. 2017). Therefore, Crowe's negligence claim premised on a police officer's alleged excessive force is not cognizable. *See, e.g.*, *McNally v. Tabor*, No. 6:18-CV-16-REW-HAI, 2019 WL 6044882, at *5 (E.D. Ky. Nov. 15, 2019) ("Kentucky courts have recognized that there is no such creature as negligent assault.").

The encounter between Crowe and the NPD had a tragic and regrettable end. Officer Steward acted, under orders and NPD policy, to effect the arrest of Crowe for immediate violent criminality. Crowe's response to the police prompted the fatal conclusion. Steward used reasonable force in response to the threatening, armed, and fast-approaching Crowe.  He had a reasonable basis to believe that, in the tense moment, Crowe posed a threat of serious physical harm to Steward himself and the accompanying officers.  Whatever laments second-guessing may afford, Steward is not liable for the reasonable, pressure-packed judgment call that resulted in Crowe's death. The Court **GRANTS** DE 24 and **DIRECTS** the Clerk to strike this matter from the Court's active docket.

Signed By:
*Robert E. Wier* /s/ REW
United States District Judge